UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CARGILL, INC., et al.                    CIVIL ACTION

VERSUS                                   NO: 11-2036

DEGESCH AMERICA, INC., et al.            SECTION: R(4)

**ORDER AND REASONS**

Defendants Degesch America, Inc. and D & D Holdings, Inc.
move to exclude two expert opinions.[1] The plaintiffs move to
exclude four expert opinions.[2] For the following reasons, the
defendants' motion to exclude is GRANTED IN PART AND DENIED IN
PART, and the plaintiffs' motion to exclude is DENIED at this
time.


**I.   Background**

This case arises out of a fire aboard the vessel M/V MARIA
V. Plaintiffs Cargill, Inc. ("Cargill") and Cargill International
SA ("CISA") contend that they were the owners, buyers, sellers,
consignees, successors in title, and/or shippers of 59,691.878
metric tons of yellow corn loaded aboard the vessel at Westwego,

---

[1] R. Doc. 50. A third defendant, Detia Degesch GmbH, has not
been served and has not made an appearance in this action. This
order and reasons refers to Degesch America, Inc. and D & D
Holdings, Inc., collectively, as the "defendants."

[2] R. Doc. 56.

Louisiana.[3] Plaintiffs Amlin Corporate Insurance, Chartis Europe, HDI-Gerling NV, Minnetonka Insurance, and Tokio Marine & Nichido Fire insured the cargo, and plaintiff The Steamship Mutual Underwriting Association (Bermuda) Limited insured Cargill and CISA's legal liability.[4]

The plaintiffs allege that, pursuant to a grain sales contract dated April 15, 2010, Cargill sold to CISA 60,000 metric tons of yellow corn, which CISA then sold to a Syrian buyer.[5] The Cargill-CISA contract called for Cargill to deliver the cargo in accordance with CISA's final documentary instructions, which required a fumigation certificate demonstrating that the vessel's holds were fumigated at 60 grams of phosphide per one thousand cubic feet of hold space.[6] Cargill contracted with defendant Degesch America, Inc. for the sale of fumigant and provision of fumigation services for Cargill's grain shipment.[7] Degesch America, Inc. agreed to fumigate the holds of the vessel using a "Subsurface Trench-In Method" and the distribution of phosphide called for in the Cargill-CISA contract.[8]

---

[3] R. Doc. 15 at 2-3, 6.

[4] *Id.* at 3.

[5] *Id.* at 5.

[6] *Id.*

[7] *Id.*

[8] *Id.*

On August 19, 2010, after the grain was loaded aboard the vessel at Cargill's export grain elevator in Westwego, Louisiana, Degesch America, Inc. and/or D & D Holdings, Inc. (collectively, "Degesch") provided the fumigant Fumitoxin, which contains the active ingredient aluminum phosphide,[9] and fumigated the corn in all seven of the vessel's cargo holds.[10] Degesch issued a Fumigation Certificate and a Statement of Fumigant Application Compliance certifying that all cargo holds were fumigated in accordance with Federal Grain Inspection Service (FGIS) rules using the Subsurface Trench-In Method, with 60 grams of Aluminum Phosphide per 1000 cubic meters of hold space.[11]

Allegedly in reliance on these representations, the vessel's crew closed and secured the cargo hatch covers, and Cargill permitted the M/V MARIA V to depart for the destination port in Syria.[12] Shortly into the journey down the Mississippi River, a series of explosions erupted in each of the vessel's seven cargo holds over the course of two hours, requiring the crew to seek safe harbor.[13] Ultimately, the vessel's classification society ordered the corn removed while the vessel underwent

---

[9] R. Doc. 69-2 at 1.

[10] R. Doc. 15 at 6.

[11] *Id.*

[12] *Id.*

[13] *Id.* at 7.

3

investigation, during which time the Syrian purchaser renounced its contract for the purchase of the corn.[14] Cargill and CISA later sold the corn at auction for a reduced price.[15]

Two surveyors who investigated the cause of the explosions concluded that Degesch had applied the fumigant in piles on the surface of the cargo rather than uniformly subsurface, as required by Degesch's own applicator's manual, FGIS regulations, and the terms of the contract.[16] The surveyors concluded that the piling method caused the fumigant to create phosphine gas at an unsafe rate, and the gas eventually combusted within the head space of each cargo hold.[17] One of the surveyors suggested that impurities or diphosphine in the fumigant may have caused the explosions.[18]

The plaintiffs' amended complaint makes claims for negligence in the manufacture and/or application of the fumigant; negligent misrepresentation in the defendants' false certification of the fumigation method used; fraudulent misrepresentation based on the same false certification; breach of contract or warranty; violation of the Louisiana Unfair Trade

---

[14] *Id.* at 8.

[15] *Id.*

[16] *Id.* at 7.

[17] *Id.*

[18] *Id* at 7-8.

4

Practices and Consumer Protection Act; and strict products liability.[19] In a previous order, the Court dismissed the plaintiffs' fraudulent misrepresentation, unfair trade practices and products liability claims.[20] Accordingly, only their negligence in the application of the fumigant, negligent misrepresentation and contract claims persist.

The plaintiffs have retained Richard Bigler and Dr. John Atherton, the two surveyors who investigated the explosions, as expert witnesses. Bigler's and Atherton's reports conclude that Degesch's method of applying the fumigant, in piles or otherwise accumulated in limited areas on the corn's surface, caused the explosions in the vessel's holds.[21]

The defendants have retained Dennis Ryman, Rodney Nohr, Dale Mann and Dr. Carl Reed as expert witnesses. Ryman's, Nohr's and Mann's reports conclude that applying the fumigant in piles could not have caused the explosions[22] and that wet conditions in the vessel's holds likely caused the explosions.[23] Reed's report concludes that condensation likely formed in the vessel's holds

---

[19] R. Doc. 15 at 10-15.

[20] R. Doc. 37.

[21] R. Doc. 50-2 at 4-5, 14-15.

[22] R. Doc. 58-1 at 3, 4; R. Doc. 58-2 at 8; R. Doc. 58-3 at 8.

[23] R. Doc. 58-1 at 10; R. Doc. 58-2 at 8; R. Doc. 58-3 at 8-9.

before the explosions.[24] Nohr's and Reed's reports conclude that
the passage of time, and not the explosions, caused the
deteriorated condition of the bulk of the corn in the weeks after
the explosions.[25]

The defendants filed a motion to exclude the opinions of
Bigler and Atherton, and the plaintiffs filed a motion to exclude
the opinions of Ryman, Nohr, Mann and Reed.[26]

## II.  Legal Standard

Federal Rule of Evidence 702, which governs the
admissibility of expert witness testimony, provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify
> in the form of an opinion or otherwise if: (a) the
> expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the
> testimony is based on sufficient facts or data; (c) the
> testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

Fed. R. Evid. 702. A district court has considerable discretion
to admit or exclude expert testimony under the Federal Rules of
Evidence. *See General Elec. Co. v. Joiner,* 522 U.S. 136, 138-39

---

[24] R. Doc. 58-4 at 7-9.

[25] R. Doc. 58-2 at 8; R. Doc. 58-4 at 9-10.

[26] R. Docs. 50, 56.

(1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.,* 200 F.3d 358, 371 (5th Cir. 2000).

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court held that Rule 702 requires the district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999) (clarifying that the *Daubert* gatekeeping function applies to all forms of expert testimony). The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance.

First, the Court must determine whether the proffered expert testimony is reliable. The party offering the testimony bears the burden of establishing its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998). The reliability inquiry requires the Court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert,* 509 U.S. at 592-93. The aim is to exclude expert testimony based merely on subjective belief or unsupported speculation. *See id.* at 590. The *Daubert* Court articulated a flexible, non-exhaustive, five-factor test to assess the reliability of an expert's methodology. These factors include: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review

and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community. *Id.* at 593-95.

Second, the Court must determine whether the expert's reasoning or methodology is relevant. The question here is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence. *See id.* at 591.

The Fifth Circuit has stated, however, that most of the safeguards provided for in *Daubert* are not as essential where, as here, the Court sits as the trier of fact in place of a jury. *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000). This is because, in a bench trial, "there is no risk of tainting the trial by exposing a jury to unreliable evidence." *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 615 F.3d 321, 330 (5th Cir. 2010).

## III. Plaintiffs' Experts

*A. Bigler*

Bigler is a professional fumigator with over 40 years' experience in the fumigation industry.[27] He opines that Degesch applied the fumigant in piles, and that this piling, in

---

[27] R. Doc. 69-1 at 1.

combination with other factors, caused the explosions in the vessel's holds.[28]

The Court concludes that Bigler's testimony is reliable. His opinion that Degesch applied the fumigant in piles on the surface of the corn is based on first-hand observation of the corn onboard the vessel after the explosions. He writes in his report that he observed discrete areas of "spent aluminum phosphide residue" on the corn's surface, indicating that the fumigant had been concentrated in certain areas.[29] Degesch's own applicator's manual confirms that the fumigant leaves behind a "gray-white powder" after decomposition.[30] The Court finds that Bigler's reasoning on this point is valid.

Bigler's opinion that piling caused the explosions is reliable as well. It is based, in part, on a published study by John Schumacher and Zachary Jason.[31] Schumacher and Jason review the methodologies and results of four series of tests conducted by two different laboratories regarding ignition of aluminum phosphide-based fumigants.[32] They additionally conduct a case study of a fire that occurred in a metal grain storage bin after

---

[28] R. Doc. 50-2 at 2, 4; R. Doc. 69-3 at 2.

[29] R. Doc. 50-2 at 2-4.

[30] R. Doc. 69-2 at 6.

[31] R. Doc. 69-3 at 3; R. Doc. 69-5 at 2.

[32] R. Doc. 69-5 at 5-9.

fumigation.[33] They conclude, "One of the most important variables in initiating the fire is concentrating the fumigant because a minimum number of tablets or pellets are required to generate enough phosphine to reach the [lower flammable level] and subsequently auto-ignite."[34] There is no indication that Schumacher and Jason's study has been discredited or widely criticized. The Court finds that the study establishes, by a preponderance of the evidence, that Bigler's reasoning is valid and not based merely on subjective belief or unsupported speculation.

The defendants contend that the Court should not consider the Schumacher and Jason study, because Bigler cited it only in a supplemental letter submitted after the deadline for disclosure of plaintiffs' expert opinions.[35] In assessing the reliability of proposed expert testimony, the Court may consider all non-privileged evidence, regardless of its admissibility. *See Daubert,* 509 U.S. at 592; Fed. R. Evid. 104(a). Bigler's supplemental letter is not a new expert opinion; rather, it clarifies aspects of his previously disclosed opinion and further explains the bases for it.[36] The Court may properly consider the

---

[33] *Id.* at 10-11.

[34] *Id.* at 12.

[35] R. Doc. 76 at 1-2.

[36] *See* R. Doc. 69-3 at 2-6.

10

letter, as well as the sources it cites as support for Bigler's opinion, in determining whether the opinion is reliable.

Finally, Bigler's proposed testimony is relevant. It directly addresses whether Degesch piled the fumigant on the surface of the corn and whether such piling caused the explosions, both central questions in the case.

## B. Atherton

Atherton is a doctor of chemistry with nearly 40 years' experience investigating chemical fires and explosions.[37] He opines that accumulation of fumigant resulted in flammable concentrations of phosphine gas, and that the gas may have ignited due to the presence of "trace amounts of diphosphine" in the fumigant.[38]

The Court concludes that Atherton's testimony must be excluded. His opinion that accumulation of fumigant led to flammable conditions is not reliable. Atherton states that the probability of reaching flammable conditions is increased "if pellets are allowed to accumulate in a heap," but he does not cite grounds for this assertion.[39] He does not reference any tests, studies or articles regarding ignition of fumigants or

---

[37] R. Doc. 69-1 at 4-5.

[38] R. Doc. 50-2 at 14-15.

[39] *Id.* at 12, 14-15.

11

explain why accumulation is related to flammability. The Court finds that the plaintiffs have not established by a preponderance of the evidence that Atherton's opinion on this point is anything more than his subjective belief or unsupported speculation. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.").

The plaintiffs contend that Atherton's opinion that accumulation of fumigant led to flammable conditions is supported by Degesch's applicator's manual, as well as the manuals for similar fumigants made by other manufacturers.[40] Indeed, these manuals state that fumigants should not be piled.[41] Atherton, however, does not indicate that he relies on these manuals, or on any data on which the manuals themselves rely.

In addition, Atherton's opinion that trace amounts of diphosphine may have caused the explosions is not reliable, because there is no indication that it is based on any actual evidence of the presence of diphosphine.[42]

## IV. Defendants' Experts

---

[40] R. Doc. 69 at 21-23.

[41] R. Doc. 69-2 at 7; R. Doc. 69-3 at 11; R. Doc. 69-4 at 3.

[42] *See* R. Doc. 50-2 at 12, 14.

12

At this time, the Court denies the plaintiffs' motion to exclude the expert opinions of Ryman, Nohr, Mann and Reed. The Court finds that the defendants' designation of experts and proposed expert testimony is cumulative and repetitive. *See* Fed. R. Evid. 403. The Court therefore requires the defendants to limit their number of experts addressing the issue of liability to no more than three and to eliminate any overlap in expert testimony. Because the defendants' final lineup of experts is not before the Court at this time, the Court declines to rule on the merits of the plaintiffs' motion to exclude.

**V. Conclusion**

For the foregoing reasons, the defendants' motion to exclude is GRANTED IN PART AND DENIED IN PART, and the plaintiffs' motion to exclude is DENIED at this time.

New Orleans, Louisiana, this __12th__ day of November, 2013.

_Sarah Vance_

   **SARAH S. VANCE**
**UNITED STATES DISTRICT JUDGE**