UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

CARGILL, INC., et al.                        CIVIL ACTION

VERSUS                                       NO: 11-2036

DEGESCH AMERICA, INC., et al.                SECTION: R(4)


                         **ORDER AND REASONS**

     Defendants Degesch America, Inc. and D & D Holdings, Inc. move for summary judgment.[1] For the following reasons, the defendants' motion is DENIED.


**I.   Background**

     This case arises out of a fire aboard the vessel M/V MARIA V. Plaintiffs Cargill, Inc. ("Cargill") and Cargill International SA ("CISA") contend that they were the owners, buyers, sellers, consignees, successors in title, and/or shippers of 59,691.878 metric tons of yellow corn loaded aboard the vessel at Westwego, Louisiana.[2] Plaintiffs Amlin Corporate Insurance, Chartis Europe, HDI-Gerling NV, Minnetonka Insurance and Tokio Marine & Nichido Fire insured the cargo.[3] Plaintiff The Steamship Mutual

---

    [1] R. Doc. 52. A third defendant, Detia Degesch GmbH, has not been served and has not made an appearance in this action. This order and reasons refers to Degesch America, Inc. and D & D Holdings, Inc., collectively, as the "defendants."

    [2] R. Doc. 15 at 2-3, 6.

    [3] *Id.* at 3.

Underwriting Association (Bermuda) Limited insured Cargill's and CISA's legal liability.[4]

The plaintiffs allege that, pursuant to a grain sales contract dated April 15, 2010, Cargill sold to CISA 60,000 metric tons of yellow corn, which CISA then sold to a Syrian buyer.[5] The Cargill-CISA contract called for Cargill to deliver the cargo in accordance with CISA's final documentary instructions, which required a fumigation certificate demonstrating that the vessel's holds were fumigated at 60 grams of phosphide per one thousand cubic feet of hold space.[6] Cargill contracted with defendant Degesch America, Inc. for the sale of fumigant and provision of fumigation services for Cargill's grain shipment.[7] Degesch America, Inc. agreed to fumigate the holds of the vessel using a "Subsurface Trench-In Method" and the distribution of phosphide called for in the Cargill-CISA contract.[8]

On August 19, 2010, after the grain was loaded aboard the vessel at Cargill's export grain elevator in Westwego, Louisiana, Degesch America, Inc. and/or D & D Holdings, Inc. (collectively, "Degesch") provided the fumigant Fumitoxin, which contains the

---

[4] *Id.*

[5] *Id.* at 5.

[6] *Id.*

[7] *Id.*

[8] *Id.*

active ingredient aluminum phosphide,[9] and fumigated the corn in all seven of the vessel's cargo holds.[10] Degesch issued a Fumigation Certificate and a Statement of Fumigant Application Compliance certifying that all cargo holds were fumigated in accordance with Federal Grain Inspection Service (FGIS) rules using the Subsurface Trench-In Method, with 60 grams of Aluminum Phosphide per 1000 cubic meters of hold space.[11]

Allegedly in reliance on these representations, the vessel's crew closed and secured the cargo hatch covers, and Cargill permitted the M/V MARIA V to depart for the destination port in Syria.[12] Within a few hours of the vessel's departure down the Mississippi River, a series of explosions erupted in each of the vessel's seven cargo holds over the course of two hours, requiring the crew to seek safe harbor.[13] Ultimately, the vessel's classification society ordered the corn removed while the vessel underwent investigation.[14] In the interim, the Syrian purchaser renounced its contract for the purchase of the corn.[15]

---

[9] R. Doc. 69-2 at 1.

[10] R. Doc. 15 at 6.

[11] *Id.*

[12] *Id.*

[13] *Id.* at 7.

[14] *Id.* at 8.

[15] *Id.*

3

Cargill and CISA later sold the corn at auction for a reduced price.[16]

Two surveyors who investigated the cause of the explosions concluded that Degesch had applied the fumigant in piles on the surface of the cargo rather than uniformly subsurface, as required by Degesch's own applicator's manual, FGIS regulations, and the terms of its contract.[17] The surveyors concluded that the piling method caused the fumigant to create phosphine gas at an unsafe rate, and the gas eventually combusted within the head space of each cargo hold.[18] The plaintiffs allege that the explosions resulted in monetary losses of about $9.5 million, including a loss in the market value of the corn of about $5.1 million.[19]

The plaintiffs' amended complaint makes claims for negligence in the manufacture and/or application of the fumigant; negligent misrepresentation in the defendants' false certification of the fumigation method used; fraudulent misrepresentation based on the same false certification; breach of contract or warranty; violation of the Louisiana Unfair Trade Practices and Consumer Protection Act; and strict products

---

[16] *Id.*

[17] *Id.* at 7.

[18] *Id.*

[19] R. Doc. 84 at 15-16.

liability.[20] In a previous order, the Court dismissed the plaintiffs' fraudulent misrepresentation, unfair trade practices and products liability claims.[21] Accordingly, only their negligence in the application of the fumigant, negligent misrepresentation and contract claims remain.

The defendants filed a motion for summary judgment.[22] At the same time, they filed a motion to exclude the proposed testimony of two expert witnesses, Richard Bigler and Dr. John Atherton.[23] In a separate order and reasons, the Court excluded Atherton's testimony but determined that Bigler's testimony was sufficiently reliable to be admissible.[24]

## II.  Summary Judgment Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists,

---

[20] R. Doc. 15 at 10-15.

[21] R. Doc. 37.

[22] R. Doc. 52.

[23] R. Doc. 50.

[24] R. Doc. 91.

the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-399 (5th Cir. 2008). The Court must draw reasonable inferences in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quotation marks removed).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence that would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quotation marks removed). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element

of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324.

The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *Id.; see also Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (quoting *Celotex*, 477 U.S. at 322).

**III. Plaintiffs' Claims Withstand Summary Judgment**

The defendants make two arguments in support of summary judgment. First, they argue that the plaintiffs have failed to offer admissible evidence that applying the fumigant in piles could have caused the explosions. Second, they argue that the plaintiffs have failed to offer evidence that the explosions caused the deteriorated condition of the corn that was not directly exposed to the explosions, which amounts to over 95 percent of the total cargo.

A.  *Evidence That Piling The Fumigant Caused Ignition*

In support of their argument that the plaintiffs lack admissible evidence to show that piling fumigant can cause it to ignite, the defendants contend that the expert opinions of Bigler and Atherton, on which the plaintiffs base this claim, are inadmissible.[25] This argument is thus contingent on the success of the defendants' motion to exclude.

Although the Court has excluded Atherton's testimony, it has found Bigler's testimony to be admissible.[26] Moreover, Bigler concludes that Degesch's method of applying the fumigant in piles caused the explosions in the vessel's holds.[27] His opinion is sufficient to establish a genuine issue for trial as to whether applying the fumigant in piles caused the explosions. Summary judgment is thus inappropriate on this ground.

B.  *Evidence That the Explosions Caused the Corn's Deteriorated Condition*

The defendants' second argument is that there is no evidence that the explosions caused the deteriorated condition of the bulk of the corn. The record indicates that the explosions thermally damaged and discolored the corn at the top of each of the

---

[25] R. Doc. 52-2 at 7-8.

[26] R. Doc. 91.

[27] R. Doc. 50-2 at 4-5.

vessel's holds.[28] Approximately two weeks after the explosions, however, surveyors determined that all of the corn had degraded significantly since it had been loaded onto the vessel.[29] Ultimately, Cargill skimmed off the thermally damaged corn, which amounted to less than five percent of the total cargo, and sold the remainder of the corn at auction as "sample grade" product.[30]

The defendants argue that the explosions impacted only the thermally damaged corn that was skimmed off the top, and that there is no evidence that the loss of value of the remainder of the corn is attributable to the explosions.[31] They thus seek summary judgment on the plaintiffs' claims for cargo losses not directly due to thermal damage.[32] The plaintiffs argue that the explosions and the consequences of the explosions, including delay in selling the cargo and additional handling of the cargo, caused the corn's degradation and loss of value.[33]

The Court concludes that there is a genuine triable issue as to whether, and to what extent, the explosions caused the damages related to the corn's loss of value. The defendants contend that

---

[28] R. Doc. 52-3 at 6, 12.

[29] *Id.* at 13-14.

[30] *Id.* at 25-26.

[31] R. Doc. 52-2 at 9-10.

[32] *Id.* at 11.

[33] R. Doc. 70 at 7-8.

damages should be calculated under the "market-value rule."[34] This principle entitles a prevailing plaintiff to damages equal to the difference between the fair market value of the cargo at the port of destination in its condition as shipped and on the date when it should have arrived, and the fair market value of the cargo as damaged on the date of discharge at the port of destination. *Ansaldo San Giorgio I v. Rheinstrom Bros. Co.*, 294 U.S. 494, 496 (1935); *Minerais U.S. Inc., Exalmet Div. v. M/V Moslavina*, 46 F.3d 501, 502 (5th Cir. 1995). Thus, if the Court accepts the defendants' theory, the fair market value of the damaged cargo on the date of discharge is a relevant consideration.

Evidence in the record indicates that the explosions caused the corn to remain on the vessel for approximately eleven days longer than it otherwise would have.[35] If, as the defendants contend, the condition of the corn was deteriorating,[36] this eleven-day delay presumably occasioned further degradation of the corn. Thus, even if the defendants are correct that the corn would have deteriorated over time anyway, there remain questions of fact as to whether the explosions caused a delay in discharge,

---

[34] R. Doc. 52-2 at 9 n.6.

[35] R. Doc. 50-2 at 16 (estimated sailing time to Syria was 22 days); R. Doc. 70-5 at 2 (vessel set sail August 15, 2010); R. Doc. 52-3 at 16 (discharge of cargo began September 17, 2010).

[36] R. Doc. 52-2 at 10.

which in turn caused, at least in part, the corn's reduced market value on the date of discharge.

The plaintiffs contend that the proper measure of damages for the loss of value of the corn is the difference between the price of the corn under CISA's contract with the Syrian buyer and the salvage value of the corn as sold at auction.[37] Under this measure of damages too there are questions of fact regarding causation. As discussed *supra*, the explosions could have caused delay in discharge of the cargo. It is a question of fact whether this delay contributed to the corn's reduced value at auction. Further, the explosions may have necessitated extra handling of the corn that could have affected its value at auction. The record indicates that the corn was discharged onto a number of barges before its sale at auction, to facilitate repairs to the MARIA V.[38] Carl Reed, one of the defendants' proffered experts, states that handling damages grain.[39] It is, therefore, a question of fact whether the explosions caused extra handling that contributed to the corn's reduced value at auction.

The Court concludes that under either the defendants' or the plaintiffs' theory of damages there remain triable questions of fact precluding entry of summary judgment.

---

[37] R. Doc. 84 at 15.

[38] *See* R. Doc. 52-3 at 11, 16-17.

[39] R. Doc. 58-4 at 1.

**IV. Conclusion**

For the foregoing reasons, the defendants' motion for summary judgment is DENIED.

New Orleans, Louisiana, this __12th__ day of November, 2013.

_____Sarah Vance_____
**SARAH S. VANCE**
**UNITED STATES DISTRICT JUDGE**